v. United States of America. Arguments not to exceed 15 minutes per side. Mr. Minnick for appellant. Good afternoon. If it pleases the court, John Minnick on behalf of appellant. Judge, I would like to reserve three minutes if possible for appellant. You may. This, on one hand simple and on another hand complex computer intrusion case, involved six counts, three of computer intrusion. Three were dismissed on the eve of trial. And no defense testimony was presented at all. Mr. Lanam was convicted largely on the basis of circumstantial evidence. The government's theory was that he was the only one who had the knowledge and passwords to have committed the intrusions. And the defense theory was that a former employee of his, Stephen Hatfield, who worked for one of the companies which suffered an intrusion, had a list of all his passwords and had the knowledge to conduct the intrusion and make it appear that Mr. Lanam had done it instead. The investigation reached something of a dead end. Neither Mr. Lanam's nor Mr. Hatfield's computers were ever examined by the FBI to see if one of them had conducted the intrusions. There would have been files on the computers which would have showed remote access. I might note here parenthetically that I don't know about my opponent, but, frankly, arguing a complex computer intrusion case like this feels to me as though I'm of the wrong generation, not having grown up with the devices. Nonetheless, the FBI missed possible other machines where they weren't preserved or examined on which evidence of the source of the intrusions would have been present. The machines were either not preserved or examined at all or were simply restarted and put back into use so that login information would have been destroyed. The issue here has to do with ineffective assistance of counsel. It does. Not sufficiency of evidence, right? That is correct. And I guess to sum it up, my position is that defense counsel didn't listen closely enough to his client about the sorts of details regarding the devices and what it would have taken to do the intrusions. And because he didn't listen closely enough, he missed the opportunity to present evidence which could have raised a reasonable doubt. Didn't he have an expert that was retained? He did have an expert who was retained remotely. He was in California, I believe. And he examined the FBI report and examined one of the machines in question to see if he could find anything there, and he didn't. He wasn't asked to search, for example, the Slack space on the computer to see whether there was evidence on that device which the FBI had not identified or located. When you say one of the computers, does that mean one of Mr. Lanham's computers or one of Mr. Hatfield's? No, neither. The only computers that were examined here, if memory serves, were devices that belonged to Air Source One, which was the site through which the intrusion was done at total mortgage. So Dean is the expert, correct? Yes. He examined the computer at Air Source? He examined a clone of the Air Source One computer. He didn't look at the Slack space. And so you're saying the clone would not have picked up? Well, the clone might have, but he simply didn't look at it. We had an expert take a look at that, and he didn't find the intruder's IP address on that device, but he found some significant facts which were not brought up at trial. Mr. Adam Kelly, local from Michigan, found that the Air Source One server had had all of its passwords changed just a month before the intrusions by the administrator, which was unusual and was not brought up at court, and suggested somebody had done that to remedy a security breach. He found that at the same time, remote access was enabled on the Air Source One computer so that a number of different people could access the device. So basically, these are other potential evidence that might have been favorable to the defense that might have been found through greater efforts. Is that a fair summary of that evidence you're talking about? Yes, it is. Mr. Kelly found, for example, that before the intrusions, which were the subject of the case, somebody... Mr. Kelly is your expert now on habeas? That's correct. He found that there was an attempted intrusion two weeks before and that the intruder at that time used both the KLANM account, KLANM being short for my client's name, as well as the administrator's account. That was not brought up at trial nor discovered by the FBI, apparently. Okay, but so then the ineffective assistance of counsel standard here has got to be not just that this is less than some other better lawyer might have done, but has to be enough to fall below the standard of reasonable representation. So what would you point to? Because what you said at first blush is additionally sophisticated, but some things were in fact done. So what would you point to to give us a standard as to why this fell below the minimum standard? I think the case should be cited in my brief Ramones v. Bergheis, a Sixth Circuit opinion, notes that the question becomes one of whether the further efforts would have resulted in one juror finding a reasonable doubt. Are you saying that Mr. Dean was not a competent expert? No, I'm saying that defense counsel didn't ask him to do enough and he didn't listen to his client closely enough. If you review the, I don't have time to detail it all, but if one reviews the testimony that was taken at the several portions of the evidentiary hearing, both by Mr. Lanham and Mr. Wise, Mr. Wise conceded there were a number of things that his client raised with him that he simply didn't do. And he said because of the passage of time by the last hearing, he could not recall precisely what his process was back at the time of trial. The counsel, the citation you have to Ramones quotes language about all it would have taken is one juror to have struck a different balance between competing stories, but it's not clear, at least to me in reading this, that they're relying there on any decision that was made or as to prejudice if already a deficient exercise has been undertaken. Because if the standard were as broad as you stated, then anything that would not have been wholly superfluous would be ineffective assistance. Well, I don't think I'm arguing for that broad a standard. What I'd like to return to is the simple point that when you read the transcript of what Mr. Lanham said he discussed with his lawyer and what Mr. Wise said, Mr. Wise just simply wasn't able to explain why he hadn't taken the additional investigative steps his client suggested. For example, Mr. Lanham said that a trainee of his who was working with him around the time of the intrusions, Philip DeGrand, might be a potential alibi witness. And DeGrand was never interviewed until after the trial of the case. And we asked him to look and see if he had any way of determining if he was working with Lanham at the time of the intrusions and it turned out he had time sheets which suggested they were both looking at the same computer at the time of two of the intrusions. One of them... Discovered four weeks after the trial was over? That's correct. Well, trial counsel never asked, never contacted DeGrand. After the trial, Lanham asked him, is there any way you can find the time sheets? And he said... Lanham asked DeGrand? DeGrand. He had contact with him. Yes, he did. But that was after the trial. Lanham had given Wise DeGrand's contact information. Wise told him, I'll contact him, not you. Wise didn't contact him. And then after the trial, DeGrand found time sheets which would have tended to establish an alibi. Or at least that it was not Lanham. The first intrusion on March 1st lasted 20 minutes. DeGrand said he was working, being trained by Lanham, and they were both staring at the same computer screen. He said if it popped up a separate remote access screen, I would have noticed that. And I didn't see any such thing in those several hours. As far as what the timing was, correct me if I'm wrong, as I understood it, even when Lanham contacted DeGrand, DeGrand didn't say, oh, I've got time sheets. He found them several weeks after that contact. Is that correct? That's correct. While looking for something else, some other financial records, he came across them, which he didn't find in the first search. So that even if, at least on its face, even if Wise had made the same kind of contact, there's no indication or assurance that he would have randomly found them? I don't know. Well, I wouldn't accept that it's logical that he would not have. If he'd known six months ahead of time to be on the eye out for them, I think it's a reasonable inference he would have found them. How much time did it take him once your client reached DeGrand to find these time sheets? Well, the first request was about four weeks after, and I don't recall precisely, it was several weeks after that DeGrand was looking for some other financial records. It wasn't even that he was looking for, you know, that he was in search of this and finally found them. I use the word random. That sounds to me pretty close, doesn't it? Maybe fortuitous. I'll buy fortuitous. I call it random. Okay. I see I don't have much time left. I would like to touch just very quickly on restitution. Restitution was ordered for devices at total mortgage which were either unnecessary or never purchased. And I note that the trial court did not, while it examined the restitution issue on remand, did not address my objections precisely. There was $7,000 spent to reload the system, and our position on that was that was unnecessary. That was not an expense that was related to the intrusion, because the viruses that they were reloading the system to eliminate preexisted and were recurring for several years prior to the intrusion. That's basically two separate amounts that you're challenging, one for the new computers and one for the reload value? Right. I think the yes, exactly. Okay. We can look at that if you want to save your rebuttal time. Thank you very much. Good afternoon. May it please the Court, my name is Graham Teel, and I represent the government here today. If I may, I'd just like to respond to a couple of items that were brought up, that was brought up during Mr. Minnick's presentation. Starting with restitution in reverse order here, there was discussion of this Cisco router, the acquisition I think of the warranty, which Total Mortgage did not have prior to the intrusion. In order for them to have the router worked on after the intrusion, they had to buy the warranty. It was Cisco's policy that they would not come in and work with a router that did not have that warranty. So Lanham had actually installed this router initially after the intrusion occurred, and in order to have it fixed, they had to acquire that warranty. Those facts were brought up at court. A question I have to you is ordinarily restitution is not a matter that comes up in a 2255. No, it's not, Your Honor. Has the government raised any issue about that? We're looking to see if there's any unconstitutional proceeding below, and I don't know if that's unconstitutional if it's not raised on direct appeal. Well, Your Honor, I would agree. There are, however, cases that would allow issues regarding restitution to be addressed in a 2255. I'm not sure I agree with those decisions, but they do exist. Are those cases where the issue was raised on direct appeal and then raised again on habeas? I don't know the answer to that, Your Honor. There was some argument regarding reloading the system because of preexisting viruses. The FBI agent in this case was pretty unusual. He was an expert himself. He had a master's degree in computer science and testified that, yes, there were preexisting viruses. However, the damages that were incurred after the firewall was disabled were the viruses that caused the costs regarding the Prusa trial. We also heard Mr. Minnick address the issue of his expert. When I first read Mr. Minnick's brief, it had been some time since I had thought about the trial. He's an articulate author, and I read that brief and said, We are in trouble. I can't believe we didn't go through all these things. When I reviewed, in fact, the record, they had all been gone into. All the damages that were brought up had been vetted at trial. Mr. Kelly didn't testify, but we heard Mr. Minnick discuss this changing of the server at Air Source, the passwords. Well, that testimony was introduced. Kirk Lanham changed those passwords three weeks prior to the intrusion. He was the network administrator for Air Source Supply System. He said there was RDP, or remote access, created on the Air Source system. There was testimony to that effect as well. Kirk Lanham created the remote access for him and Paul Staples, a rather naive user, if you will, and owner of the Air Source system. Let's see. If the panel had any other questions, I'd be glad to answer them, but I would submit to the panel that all of the damages that have been complained about, all the lack of testimony about these damages was, in fact, introduced. That goes to the money part, but as far as the ineffective assistance, where his complaint is, I take it, that Mr. Kelly, his current expert, was able to come up with arguments, at least, potentially evidence, but at least arguments that would have been helpful that Mr. Dean did not. What do you have to say to him? I think that's a fair statement of his position. What do you have to say to that? I don't think that that's the case. I don't think Mr. Kelly raised anything in his report or the affidavit that was filed with the court that had not been introduced at trial. As I said, the passwords that Mr. Kelly talked about being changed, there was testimony about that during the trial. What had happened is that the logging on Air Source supply system had been disabled. That ended the tracing backwards to find out who had initially intruded. And the fact that the logging was disabled as to when and how that happened, are you saying that was known and introduced at trial? The fact that it was disabled was introduced at trial. There was no evidence introduced, as I recall, as to when it was disabled. Have they found answers to that since the trial? No, they have not. It ends any inquiry beyond that. So Air Source systems computers were accessed remotely. And because Air Source systems logging was disabled, we can't determine what happened prior to that or the next link, if you will. The circumstantial evidence at trial was compelling, however. If the panel doesn't have any further questions, I don't have any. What about this witness? He claims that he told his lawyer about the witness, LeGrand, and he could have testified about the fact they were working together and therefore he couldn't possibly have done it on the time and place. How bad? It seems to me that that testimony is incredible on its face, to say that somebody sat down, an intern, I think Mr. DeGrand was described as, sat down at a computer screen for a day and could tell us during that entire time that Mr. Lanham did not commit a 10-minute and an 8-minute intrusion, which in effect could have been done very surreptitiously, very easily done. So I don't think that that testimony was very damaging to the government's case, even if it had been introduced. Secondly, I don't think there was any prejudice at the trial because, as the panelists pointed out, this information was not obtainable during the trial. That would be my response to Mr. DeGrand. How much time expired between the time that the defendant Lanham told his lawyer about this witness so he could have been going back through all these records? Your Honor, it's my understanding that Mr. DeGrand was asked at or about the time of the trial to find these records and was unable to do so. And it wasn't until the 2255 proceeding that this information became available, or shortly before the 2255 proceeding. It was, what, several months or so? Yes. That's my understanding. Where would we find that timeline? Are there affidavits or depositions? I don't think it's in the record, Your Honor. Okay. We'll see what your adversary has to say on that. Anything else, judges? No. Okay. Thank you, counsel. Thank you. All right. You have three minutes. If you have enlightenment on where we could look in the record for the DeGrand timeline, you could add that at your leisure. Yes. Mr. DeGrand and Mr. Lanham both testified about this at one of the later evidentiary hearings. The testimony is in the record. At the 2255 hearing? Yes. Okay. I just took a look at DeGrand's timesheets. The times in question, March 1st and March 8th, his timesheets reflected that he was with Mr. Lanham for just three hours, not all day. And especially with the – my notes indicate that the first intrusion was 20 minutes. And 20 minutes out of three hours, I think I could argue to a jury, would have been very notable. But it's unlikely in that timeframe that that could go on without DeGrand seeing it. Did they use the same screen or keyboard or anything? Yes. The testimony was that Lanham was on the computer that he was training DeGrand to use and DeGrand was standing over his shoulder or seated next to him, watching the same screen as Lanham instructed him what commands had to be given to make the device function. The whole time? Yes. All three hours? Well, he said, you know, in three hours' time. I wouldn't have been away from him for 20 minutes. He couldn't have done that without me seeing it. There was a question about the logging disabled at the Air Source 1 machine. There were two machines in question. One served as the route for the intruder. There was another device called a Linux server, which served as a firewall, and it would have stored all incoming traffic, and the FBI simply didn't grab that machine. And by the time of the 2255, that machine had been turned on and off and would no longer have had the data. That was one of Kelly's conclusions. So the machine would never have been turned off and on before trial either? No, it would have been, but at the time that the FBI went out to do the investigation, if they had realized it and grabbed the machine, they would have had the intruder's address. Okay, but that's a government failure which could be attacked, I suppose. Yes. It's not affirmatively that they didn't take some opportunity to get it. No, they just didn't understand. Finally, with regard to restitution, I think it's still alive. The procedural history of this case is complex. The district judge promised me a restitution hearing at sentencing. He issued the judgment several hours later in error. It included the restitution amount. We wound up appealing in the middle of the 2255 to this court on an unrelated issue. You remanded it back to him. When he got the case back, he said in a letter that's quoted in his opinion denying this that we have two things ahead of us. One of them is a restitution hearing. He addressed the restitution hearing on the merits in his opinion denying the 2255, and he granted a certificate of appealability on everything I raised. So I think the issue is right despite the procedural curiosity. So you think this court can consider restitution on a 2255 if it's not raised in the original appeal? How did we get to that? Even if the district court heard it, I'm not sure we can hear it. Well, by virtue of the fact that the court had said it was going to hold a separate restitution hearing. Then it issued the judgment in error. It didn't hold the hearing until it addressed the issue in the context of this same evidentiary hearing. You're talking about the original case or the 2255 case? The 2255. The court must have, did it not grant restitution in the original judgment? It did in error. I cited a couple of cases in my brief for the proposition that a difference between an oral pronouncement of sentence and the judgment of sentence, in the case of that where there's a variance, the oral pronouncement controls. And Judge Cohen said he intended to hold a restitution hearing, and I asked him at the sentencing, I said, you know, we should do this as a unitary hearing because the same issues of loss are involved. So I think the issue is appropriately before you, even if it's an unusual procedural posture. Are you saying from that that he didn't make an oral pronouncement of the restitution amount? That is correct. He said he was reserving it for a hearing. Okay, but that hearing didn't happen. Until we did the 2255. So you're saying that effectively the restitution part of the 2255 was kind of a nunk-pro-tunk of the direct sentencing? Yes, because the same issues were involved. It would have been, seemed somewhat foolish to shift gears and say, okay, you've heard all the testimony about losses. Now we're going to represent the testimony on the restitution hearing. I mean, and I don't think, it never occurred to me that that would be a problem. He addressed it. He said he was going to address it. He addressed it, and he granted a certificate of appealability on it. Okay, so another way of looking at it would be that the restitution hearing that did happen as part of the 2255, you could say that procedurally you could have said, okay, let's push a button and call it the restitution hearing as part of the direct sentencing because we haven't had one. That's correct. Okay, anything else? Thank you very much. Thank you, counsel. Case will be submitted. Clerk may call the next case.